Ada M. MARTIN and Harold L. Martin, Plaintiffs–Appellants,

v.

TELECTRONICS PACING SYSTEMS, INC.; TPLC, Inc. d/b/a Telectronics Pacing Systems; Telectronics PTY Limited, Defendants–Appellees.

No. 94–4003.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 3, 1996.

Decided Jan. 31, 1997.

Frank A. Ray (argued and briefed), Ray, Todaro & Alton, Terry L. Kilgore (briefed), Columbus, OH, for Plaintiffs-Appellants.

David C. Greer (briefed), Howard P. Krisher, Bieser, Greer & Landis, Dayton, OH, Michael J. Weber (argued), James A. Gale, Feldman, Gale & Weber, Miami, FL, for Defendants-Appellees.

Steven Glickstein (briefed), Kaye, Scholer, Fierman, Hays & Handler, New York City, for Health Industry Manufacturers Association, Amicus Curiae.

Before: KENNEDY and MOORE, Circuit Judges; JOHNSTONE, Senior District Judge.*

KENNEDY, Circuit Judge.

In this products liability suit, plaintiffs, Ada and Harold Martin, appeal the District Court's summary judgment in favor of defendants, awarded largely on the basis of pre-

---

* The Honorable Edward Johnstone, Senior United States District Judge for the Western District of Kentucky, sitting by designation.

emption under 21 U.S.C. § 360k(a) of the Medical Device Amendments of 1976 to the Federal Food, Drug and Cosmetic Act. We previously affirmed the judgment of the District Court. *Martin v. Telectronics Pacing Sys., Inc.*, 70 F.3d 39 (6th Cir.1995). Thereafter, the United States Supreme Court granted plaintiffs' petition for writ of certiorari, vacated our prior judgment, and remanded the case to our Court for further consideration in light of its decision in *Medtronic, Inc. v. Lohr*, —— U.S. ——, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). *Martin v. Telectronics Pacing Sys., Inc.*, —— U.S. ——, 116 S.Ct. 2576, 135 L.Ed.2d 1091 (1996). Pursuant to the Supreme Court's order, the case is again before us for our determination.

## I.

### Factual Background

The plaintiffs filed suit against Telectronics Pacing Systems, Inc. ("Telectronics") after Ada Martin suffered injuries resulting from the implantation of the Telectronics Guardian ATP 4210 Implantable Cardioverter–Defibrillator–Demand Pacemaker ("device"). The device, which combines the functions of a defibrillator, a cardioverter, and a pacemaker, was one of fifty such experimental devices. The device is implanted into the patient's body and generates electrical shocks, when necessary, to maintain a normal heart rhythm.

On the morning of March 31, 1992, Ada Martin signed a form consenting to implantation of the device to correct a heart ailment. Later that day, doctors at the Ohio State University Hospitals implanted the device into Ada Martin's chest. Plaintiffs claim that the device began to malfunction sometime after the operation and was therefore replaced in a subsequent operation on November 19, 1992. As a result of the alleged malfunction of the device, the Martins claim that they suffered $500,000 in damages.

Plaintiffs allege five causes of action under Ohio products liability law pursuant to Ohio Revised Code §§ 2307.74–.78. The Complaint alleges that the defendant (1) defectively manufactured the device; (2) defectively designed the device; (3) failed to adequately warn plaintiffs; (4) failed to conform to certain unidentified "express representations;" and (5) supplied the device in question to plaintiffs. Ada Martin's spouse also pleaded a derivative common-law tort claim alleging that he suffered loss of consortium and companionship as a result of the defendant's conduct.

Telectronics filed for summary judgment on all of the plaintiffs' claims arguing that they were preempted by section 360k(a) of the Medical Device Amendments. The District Court granted Telectronics' motion. On appeal, we affirmed the judgment of the District Court and held that all of plaintiffs' claims were preempted. Additionally, we held that the finding of preemption did not violate the plaintiffs' Seventh Amendment right to a jury trial. Subsequently, plaintiffs petitioned the United States Supreme Court for a writ of certiorari. Their petition was granted and the Supreme Court remanded the case to our Court for reconsideration in light of the Court's decision in *Medtronic, Inc. v. Lohr, supra.*

## II.

### Standard of Review

Despite the Supreme Court's order vacating and remanding the case for our redetermination, our standard of review remains unchanged. This Court's review of a grant of summary judgment is *de novo;* it uses the same test as used by the District Court. *See Brooks v. American Broadcasting Cos.*, 932 F.2d 495, 500 (6th Cir.1991), *cert. denied*, 510 U.S. 1015, 114 S.Ct. 609, 126 L.Ed.2d 574 (1993). In reviewing summary judgment motions, courts must view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Under FED.R.CIV.P. 56(c), summary judgment is proper if the evidence " 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to [a] judgment as a matter of law.' " *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597,

601 (6th Cir.1988)(quoting FED.R.CIV.P. 56(c)).

## III.

### Medtronic, Inc. v. Lohr

In *Medtronic, Inc. v. Lohr*, the Supreme Court was presented for the first time with the question of whether the MDA preempts state common law actions against the manufacturer of an allegedly defective medical device. Lora Lohr and her husband filed suit against Medtronic alleging strict liability, negligent design, negligent manufacturing, and inadequate labeling under Florida state law after Lora Lohr was implanted with a pacemaker manufactured by Medtronic which contained an allegedly defective lead. The pacemaker lead was exempted from the rigorous premarket approval ("PMA") process under the § 510(k) process for substantially equivalent devices. *Medtronic* at 2248. After the defendant removed the case to federal court, Medtronic moved for summary judgment arguing that all of the plaintiffs' claims were preempted under § 360k(a). That section provides:

> § 360k. State and local requirements respecting devices
>
> (a) General rule
>
> Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a).

The district court initially denied the motion. However, soon after its decision, the United States Court of Appeals for the Eleventh Circuit in an unrelated case held that § 360k required preemption of at least some common law claims. Thereafter, the district court reconsidered its prior ruling and dismissed the plaintiffs' complaint. *Id.* at ——, 116 S.Ct. at 2249. The Eleventh Circuit reversed, in part, holding that the Lohrs' negligent design claim and their strict liability claim arising from an unreasonably dangerous design were not preempted by the MDA. The Eleventh Circuit upheld the dismissal of the Lohrs' negligent manufacturing and negligent failure to warn claims on preemption grounds. *Id.* The Supreme Court granted Medtronic's petition and the Lohrs' cross-petition for certiorari in light of the division amongst the circuit courts over the extent to which common law claims are preempted by the MDA. *Id.* at ——, 116 S.Ct. at 2250.

In a five to four decision, the Court held that none of the plaintiffs' common law claims were preempted by the MDA. *Id.* at ——, 116 S.Ct. at 2258. The plurality opinion was authored by Justice Stevens and was joined by Justices Kennedy, Souter, and Ginsburg. Justice Breyer wrote a separate opinion, concurring in part and concurring in the judgment, in which he joined in five of seven parts of Justice Stevens' opinion. Thus, the five sections joined by Justice Breyer (Sections I, II, III, V, and VII) constitute the opinion of the Court.

In determining the extent to which the MDA preempts state common law claims, the Court first noted that, while § 360k(a) is an express preemption provision in the MDA, the scope of federal preemption under § 360k(a) is ambiguous. *Id.* at ——, 116 S.Ct. at 2255. This ambiguity in addition to Congress' express grant of authority to the Food and Drug Administration ("FDA") to implement the MDA, in the Court's opinion, rendered the FDA's interpretation of the statute entitled to substantial weight. *Id.* at ——, 116 S.Ct. at 2256. According to FDA regulations:

> State or local regulations are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements.

There are other State or local requirements that affect devices that are not preempted by section 521(a) of the act because they are not 'requirements applicable to a device' within the meaning of section 521(a) of the act. The following are examples of State or local requirements that are not regarded as preempted by section 521 of the act:

(1) Section 521(a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g. requirements such as general electric codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.

(2) Section 521(a) does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act.

21 C.F.R. § 808.1(d)(1996).

Based on this language, the Court concluded that the statutory and regulatory language mandate that preemption occur only when the state and federal requirements meet certain criteria. A state requirement must be "'with respect to'" a medical device and must be "'different from, or in addition to'" federal requirements. *Medtronic* at ——, 116 S.Ct. at 2257. Moreover, the state requirement must relate "'to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device.'" *Id.* Finally, "[s]tate regulations of 'general applicability' are not preempted except where they have 'the effect of establishing a substantive requirement of a specific device.'" *Id.* The federal requirement "must be 'applicable to the device' in question … and preempt state law only if they are 'specific' to a 'particular device.'" *Id.* The Court divided on whether state common law actions could ever be preempted by the MDA. Significantly, a majority of the Court held that such actions do impose "requirements" under the MDA and are therefore preempted when the other conditions, as aforementioned, are satisfied. *Id.* at ——, 116 S.Ct. at 2262.

Regarding the specific claims brought by the Lohrs, the Court held that none of their claims were preempted. *Id.* at ——, 116 S.Ct. at 2259. With respect to the defective design claim, the Court concluded that, because the device was approved pursuant to the § 510(k) process, the device was never reviewed for safety and efficacy. Thus, because the § 510(k) process did not impose a federal "requirement," the claim was not preempted. *Id.* at ——, 116 S.Ct. at 2254.

Regarding the manufacturing and labeling claims, the Court rejected Medtronic's argument that federal regulations governing the labeling and manufacture of all medical devices were federal "requirements." The Court rejected the argument because federal labeling and manufacturing regulations "reflect important but entirely generic concerns about device regulation generally, not the sort of concerns" contemplated by the preemption provision of the MDA. *Id.* at ——, 116 S.Ct. at 2258. Furthermore, the state common law requirements were not specifically developed "with respect to" medical devices and were not "the kinds of requirements that … would impede … the implement[ation] and enforce[ment] [of] specific federal requirements." *Id.* at ——, 116 S.Ct. at 2258. The state requirement regarding negligent manufacturing was simply "the general duty of every manufacturer to use due care to avoid foreseeable dangers in its products." *Id.* at ——, 116 S.Ct. at 2258. Similarly, the "failure to warn claim is the general duty to inform users and purchasers of potentially dangerous items of the risks involved in their use." *Id.* Thus, none of these state requirements were "with respect to" a medical device. Accordingly, none of the plaintiffs' claims were preempted.

Lastly, the Court concluded that if further development of the record and the plaintiffs' theories of recovery revealed that the Lohrs' action included a claim that Medtronic failed to comply with FDA regulations, that claim would not be preempted because "nothing in § 360k denies [a state] the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements." *Id.* at ——, 116 S.Ct. at 2255.

## IV.

### A. PMA, § 510(k) Process, and IDE

The MDA comprehensively regulates medical devices. Within the comprehensive regulations, the FDA classifies medical devices intended for human use into three categories based on the degree of regulation necessary to assure the device's safety and effectiveness. 21 U.S.C. § 360c. Class III [1] devices are subject to the most stringent controls as they present a "potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(1)(C). In order to market a Class III device, a manufacturer must provide the FDA with a "reasonable assurance" that the device is both safe and effective. 21 U.S.C. § 360e(d)(2). To prove that the device is reasonably safe and effective, the manufacturer must obtain premarket approval ("PMA") through a long process that requires the manufacturer to submit to the FDA detailed information about the safety and effectiveness of the device. *Medtronic* at ———––—, 116 S.Ct. at 2246–47. The manufacturer must submit a bibliography of all reports concerning the device's safety and effectiveness, an outline of the device's components and properties, a description of the manufacturing process, safety data, samples of the device, and copies of all proposed labeling. 21 U.S.C. § 360e(c)(1); 21 C.F.R. § 814.20 (1996). As noted by the Supreme Court in *Medtronic,* the FDA then reviews the information spending an average of 1200 hours on each submission. *Id.* at ———, 116 S.Ct. at 2246.

There are exceptions to the PMA requirement which manufacturers may utilize to avoid the rigorous PMA process, two of which are relevant to the case at hand. First, the MDA allows devices that are "substantially equivalent" to preexisting devices to avoid the PMA process in order to permit them to compete with devices that were on the market prior to 1976 when the MDA was enacted. 21 U.S.C. § 360e(b)(1)(B). This was the exception at issue in *Medtronic.* Manufacturers of "substantially equivalent" Class III devices must submit to a limited form of review known as "premarket notifica-

tion" or "the § 510(k) process" which allows the device to be marketed without inquiry and without submitting much information if the FDA determines that the device is substantially equivalent to a preexisting device. *Medtronic* at ———, 116 S.Ct. at 2247. In contrast to the lengthy PMA process, the 510(k) process is completed in an average of only 20 hours. *Medtronic* at ———, 116 S.Ct. at 2247.

A second exception exempts investigational devices from the PMA process in order "to encourage, to the extent consistent with the protection of public health and safety and with ethical standards, the discovery and development of useful devices intended for human use." 21 U.S.C. § 360j(g). This exception is called the "Investigational Device Exemption" ("IDE"). Although investigational devices are not subject to the rigorous PMA process, they are subject to a different set of complex and comprehensive regulations which set forth detailed procedures for determining whether investigational devices are safe and effective. *See* 21 U.S.C. § 360j(g)(3); 21 C.F.R. §§ 812.20, 812.25, 812.27 (1996).

To obtain approval of a device under the IDE, a manufacturer must submit an application to the FDA containing an abundance of information. Pursuant to 21 C.F.R. § 812.20, the manufacturer must submit an application setting forth a complete report of all prior investigations and a "description of the methods, facilities, and controls used for the manufacture, processing, packing, storage, and where appropriate, installation of the device, in sufficient detail so that a person generally familiar with good manufacturing practices can made a knowledgeable judgment about the quality control used in the manufacture of the device." 21 C.F.R. § 812.20.

Pursuant to 21 C.F.R. § 812.25, the manufacturer must submit a detailed statement regarding the intended use of the device and the objectives and planned duration of the investigational study; a written protocol describing the methodology to be used and an

---

**1.** The device at issue in the instant case would be classified as a Class III device as pacemakers are

Class III devices. *Medtronic* at ———, 116 S.Ct. at 2246; 21 C.F.R. § 870.3610 (1995).

analysis of the protocol demonstrating that the investigation is scientifically sound; an analysis of all risks involved; a description of each component, ingredient, property, and principle of operation of the device; a detailed description of the methods, facilities and controls used for manufacturing, processing, packing, storing and installing the device; sample agreements between the manufacturers and all proposed investigators; detailed information about the health care professionals and institutions participating in the investigation; proposed labeling; proposed informed consent forms; and a full set of written procedures for monitoring the investigation, including record and report maintenance. Pursuant to 21 C.F.R. § 812.27, the manufacturer must submit a bibliography of every publication relevant to the evaluation of the device and information from non-clinical testing.

Based on the information submitted, the FDA will approve the device under the IDE unless "the risks to the subjects are not outweighed by the anticipated benefits to the subjects and the importance of the knowledge to be gained, or informed consent is inadequate, or the investigation is scientifically unsound, or there is reason to believe that the device as used is ineffective." 21 C.F.R. § 812.30. Once the device is approved under the IDE, the device is exempted from, among other things, compliance with performance standards and good manufacturing practice requirements. 21 C.F.R. § 812.1(a).

## B. Telectronics' Device

The Medtronic device's exemption from the PMA process by way of the § 510(k) notification process was central to the outcome of *Medtronic*. Justice Stevens, speaking for the Court, recognized that the § 510(k) process is "focused on equivalence, not safety," and as a result, "substantial equivalence determinations provide little protection to the public." *Medtronic* at ——, 116 S.Ct. at 2254. Having concluded that the device implanted into Lohr was never formally reviewed under the MDA for safety and efficacy because it was not approved pursuant to the PMA process, the Court held that

the Lohrs' design defect claim was not preempted. *Id.* at ——, 116 S.Ct. at 2255. Furthermore, although Justice Stevens noted in Part VI of his opinion that "few, if any, common-law duties have been preempted by this [§ 360k] statute," *id.* at ——, 116 S.Ct. at 2258, this statement garnered strong criticism from five other members of the Court and was, thus, not joined by a majority of the Court. The opinions of Justice Breyer and O'Connor suggest that design claims involving devices approved outside of the § 510(k) process may be preempted. For example, Justice Breyer posed an example of a hypothetical MDA regulation requiring use of a 2-inch wire in a device with a hypothetical "award by a jury persuaded by expert testimony that use of a more than 1-inch wire is negligent." *Id.* at ——, 116 S.Ct. at 2259. Using this example, he concluded that if the hypothetical provision in the MDA would preempt a state regulation of a 1-inch wire, then the MDA would have to preempt a similar requirement embodied in a standard of care or behavior. *Id.*

Justice O'Connor, joined by the Chief Justice, Justice Scalia and Justice Thomas, agreed. Justice O'Connor opined that "state common-law damages actions do impose 'requirements' and are therefore pre-empted where such requirements would differ from those imposed by the FDCA." *Id.* at ——, 116 S.Ct. at 2262. Justice O'Connor, however, agreed that the Lohrs' defective design claim was preempted because the device was approved through the § 510(k) process and that process "merely evaluates whether the Class III device at issue is substantially equivalent to a device that was on the market before 1976, the effective date of the Medical Device Amendments" and therefore does not place any 'requirements' on the device. *Id.* at ——, 116 S.Ct. at 2263. Regarding the manufacturing and labeling claims, Justice O'Connor would not subscribe to the plurality's requisite of "specificity." In her view, the common law claims would be preempted because, if successful, they would impose state requirements different from or in addition to the comprehensive federal requirements regarding manufacturing set out in the FDA's Good Manufacturing Practice, 21 C.F.R. §§ 820.20–820.198 (1996), and labeling

set out at 21 C.F.R. § 801.109. Thus, although Justice Breyer agreed with Justice Stevens' opinion imposing a specificity requirement, a majority of the Court (Justices Breyer, O'Connor, Scalia, Thomas, and Chief Justice Rehnquist) agreed that the MDA preemption provision could preempt state law causes of action where the state law differs from or is in addition to requirements imposed by the MDA.

Unlike the general federal requirements discussed in *Medtronic,* the regulations governing investigational devices are essentially device specific. There are no specific regulations governing pacemakers like the one at issue; however, the application and approval process under the IDE is device specific. For example, the FDA requires information regarding "the methods, facilities, and controls used for manufacture ... of the device, in sufficient detail so that a person generally familiar with good manufacturing practices can make a knowledgeable judgment about the quality control used in the manufacture of the device." 21 C.F.R. § 812.20(b)(3). The FDA then exempts the device, if approved, from the general requirements of *good manufacturing practice that would ordinarily apply.* 21 C.F.R. § 812.1(a). In reviewing the application, the FDA calculates the risks and benefits of the particular device and grants an exemption only if the risks are outweighed by the benefits to the subjects. 21 C.F.R. § 812.30(b)(4).

It is, thus, imperative that we determine whether the device at issue was approved as an investigational device or through the § 510(k) process. The plaintiffs contend that Ms. Martin's injuries were likely caused by a part of the device called the Y-adapter[2] and they contend that the Y-adapter was approved under the § 510(k) process.[3] They

claim that neither the Y-adapter nor the Model 033–572 leads were included in the IDE granted to Telectronics for the 4210 system. It was not included, they argue, because Telectronics had received a § 510(k) substantially equivalent exemption for the Y-adapter[4] and for the leads of the device.

As Telectronics notes, the record reveals that, in its motion for summary judgment as to the Model 033–572 leads and the Y-adapter,[5] Telectronics argued in the alternative. It first argued that the leads and the adapter were approved by the FDA pursuant to the § 510(k) premarket notification procedure and that claims against devices approved under § 510(k) are preempted. Alternatively, it argued that, although the two component parts were approved under the § 510(k) process, the device as a whole was approved under IDE, and claims against devices approved under the IDE are preempted.

In their response to the motion for summary judgment, plaintiffs conceded, "[i]t is undisputed that the product system, including the defibrillator, connectors, sense/pace leads, and adapter, is currently a medical device subject to investigational testing ... At all times relevant to this case, the product system had secured 'investigation device exemption' (IDE) under MDA." In the same pleading, plaintiffs also conceded, in response to Telectronics' argument that plaintiffs failed to identify the defective part in the device, "[a]t issue is not what component of the product system failed; rather, the issue is whether or not the product system failed."

The record supports the conclusion that the Y-adapter and the Model 033–572 leads were approved under the § 510(k) process. On July 14, 1989, the FDA notified Telectronics by letter of its approval of the Model 033–572 leads under § 510(k). On July 19,

---

2. Before the trial court, plaintiffs contended that the device's malfunction was caused by either the Model 033–572 right sense/pace lead or the Y-adapter.

3. The device contains four component parts: (1) Model 4210 defibrillator; (2) Model 040–106 leads; (3) Model 033–572 leads; and (4) Model 033–415 Y-adapter.

4. The record indicates, however, that Telectronics received the substantially equivalent exemp-

tion for the Y-adapter after it received the IDE for the entire device.

5. Telectronics filed two separate motions for summary judgment. The first was filed as to the defibrillator and Model 040–106 defibrillator leads. The court granted Telectronics' motion regarding those devices. The second motion, which was also granted, was filed as to the Model 033–572 leads and the Y-adapter.

1990, the FDA approved of the Telectronic Guardian ATP Model 4210 System as an investigational device. On April 1, 1991, the FDA approved the Y-adapter under the § 510(k) process.

■ The District Court acknowledged the parties' agreement that the device was approved under the IDE and, accordingly, examined the device as a whole. The District Court, therefore, did not address the effect of the FDA's separate approval of the two component parts under the § 510(k) process. This Court in plaintiffs' first appeal similarly treated the device as a whole as an investigational device. *Martin* at 41.

On remand, apparently recognizing the advantage of classifying the defective part as approved under the § 510(k) process after *Medtronic,* plaintiffs now stress that the Y-adapter and the Model 033-572 leads were approved under the § 510(k) process. We decline, on remand, to adopt the Martins' newly constructed argument. We believe it appropriate to instead view the device as a whole, approved as an investigational device, as conceded by the Martins in the proceedings below.

## V.

### Plaintiffs' Causes of Action After *Medtronic* [6]

#### A. Manufacturing Defect

Count I of Plaintiffs' complaint asserts a manufacturing defect claim pursuant to Ohio Revised Code § 2307.74 which provides:

> A product is defective in manufacture or construction if, when it left the control of its manufacturer, it deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards. A product may be defective in manufacture or construction as described in this section even though its manufacturer exercised all possible care in its manufacture or construction.

Ohio Rev.Code Ann. § 2307.74 (Anderson 1995). To preempt this claim, the federal requirement regarding manufacturing "must be 'applicable to the device' in question ... and 'specific' to a 'particular device.'" *Medtronic* at ——, 116 S.Ct. at 2257. As discussed above, the regulations governing manufacturing of the device at issue in this case are specific to investigational devices. Unlike the manufacturing claim in *Medtronic,* where the federal manufacturing regulations "reflect[ed] important but entire generic concerns about device regulation generally, not the sort of concerns" contemplated by the preemption provision of the MDA, *id.* at ——, 116 S.Ct. at 2258, the regulations governing manufacturing at issue here specifically apply to investigational devices.

In order to preempt this claim, however, the state requirement must be " 'with respect to' " a medical device as well as " 'different from, or in addition to' " federal requirements. *Id.* at ——, 116 S.Ct. at 2257. Moreover, the state requirement must relate " 'to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device.'" *Id.* "State regulations of 'general applicability' are not preempted except where they have 'the effect of establishing a substantive requirement of a specific device.'" *Id.*

■ Given that the FDA specifically approves of the manufacturing adequacy of the device for investigational purposes under 21 C.F.R. § 812.30(b)(5) and exempts an investigational device from the good manufacturing requirements normally applicable to devices approved under the PMA process, the state

---

**6.** No other circuit court has yet had the opportunity to decide whether state causes of action for injuries caused by investigational devices are preempted by the MDA after *Medtronic.* However, one federal district court held that state law claims sounding in strict liability and negligence were preempted in a case involving a prosthetic hip replacement approved as an investigational device. *See Berish v. Richards Medical Co.,* 937 F.Supp. 181 (N.D.N.Y.1996). In contrast, the Missouri Supreme Court held that causes of action for negligence, strict liability, failure to warn, lack of informed consent, and fraud were not preempted in a case involving an intraocular lens implant approved as an investigational device. *See Connelly v. Iolab Corp.,* 927 S.W.2d 848 (Mo.1996).

statute applies a requirement different from that imposed by federal law. However, it is questionable whether the statute is "with respect to" a medical device and not simply of general applicability. In *Medtronic,* the state common law requirements regarding manufacturing were not specifically developed "with respect to" medical devices and were not the kinds of requirements that would impede the implementation and enforcement of specific federal requirements. *Medtronic* at ——, 116 S.Ct. at 2258. The state requirement regarding negligent manufacturing was simply "the general duty of every manufacturer to use due care to avoid foreseeable dangers in its products." *Id.* at ——, 116 S.Ct. at 2258. The same cannot be argued with respect to the generally applicable statute in question because it is the kind of requirement that would impede the implementation and enforcement of specific federal requirements. *Id.* The purpose of the exemption for investigational devices is to promote safety and innovation, the twin aims of the investigational device exemption of the MDA. To allow a cause of action for a manufacturing defect under state law where the FDA has specifically exempted an investigational device from Good Manufacturing regulations would thwart the goals of the IDE exemption "to encourage, to the extent consistent with the protection of public health and safety and with ethical standards, the discovery and development of useful devices intended for human use." 21 U.S.C. § 360j(g). We, therefore, hold that the Martins' manufacturing defect cause of action is preempted.

### B. Design Defect

Plaintiffs' design defect claim asserted in Count II of their complaint arises from Ohio Revised Code § 2307.75 which provides, in part:

a product is defective in design ... if either of the following applies:

(1) When it left the control of its manufacturer, the foreseeable risks associated with its design or formulation ... exceeded the benefits associated with that design ...

(2) It is more dangerous than an ordinary consumer would expect when used in an

intended or reasonably foreseeable manner.

Ohio Rev.Code Ann. § 2307.75.

■ It is this claim that most sharply differs from the analysis of the design defect claim in *Medtronic.* With respect to the Lohrs' defective design claim in *Medtronic,* the Court concluded that, because the device was approved pursuant to the § 510(k) process, the device was never reviewed for safety and efficacy. Thus, because the § 510(k) process did not impose a federal "requirement," the claim was not preempted. *Medtronic* at ——, 116 S.Ct. at 2254. In stark contrast, the device at issue here was approved as an investigational device and its risks and benefits were specifically reviewed and balanced in accordance with 21 C.F.R. § 812.30. Thus, because under the federal requirement the FDA has determined that the benefits of the device outweigh the risks and, under the state requirement, a jury in a state court action could conclude that the risks outweigh the benefits, the state requirement is different from the federal requirement. In addition, subsection two of Ohio Revised Code § 2307.75 regarding consumer expectations is a requirement "in addition" to the requirements of the federal regulations.

We again face the question of whether the state requirement was developed "with respect to" medical devices. Again, the state requirement appears not specifically applicable solely to medical devices. However, the state statute is the kind of requirement that would impede the implementation and enforcement of specific federal requirements. *Medtronic* at ——, 116 S.Ct. at 2258. To allow a cause of action for design defect where the FDA has specifically approved of the design of the device for investigational purposes would thwart the goals of safety and innovation. Accordingly, Count II of Plaintiffs' complaint is similarly preempted.

### C. Inadequate Warning

Plaintiffs' inadequate warning claim arises from Ohio Revised Code § 2307.76. Section 2307.76 generally provides that a product is defective where the manufacturer fails to issue adequate warnings when the manufac-

turer knew or, in the exercise of reasonable care, should have known of a risk of harm to the consumer. The federal regulations regarding investigational devices set forth several requirements concerning warnings. First, the label on an investigational device must bear a warning that the device is for investigational purposes only and must describe "all relevant contraindications, hazards, adverse effects, interfering substances or devices, warnings, and precautions." 21 C.F.R. § 812.5(a). In addition, during the application process, the manufacturer must submit the label to the FDA for its review. 21 C.F.R. § 812.25(f). Most importantly, during the application process, the manufacturer must submit the consent form to be signed by the subject. 21 C.F.R. § 812.25(g).

Ms. Martin reviewed and signed the consent form reviewed by the FDA in the case at hand. The consent form notified Ms. Martin, *inter alia:* (1) that the cardioverter/defibrillator was an investigational device not yet approved by the FDA; (2) of the availability of an alternative FDA approved device; (3) of the risks of the device such as repeat operation and component failure; and (4) that there may be clinical or technical reasons for failure of the device not currently known.

■ The Supreme Court in *Medtronic* rejected Medtronic's argument that federal regulations governing the labeling of all medical devices were federal "requirements." The Court rejected the argument because federal labeling regulations "reflect important but entirely generic concerns about device regulation generally, not the sort of concerns" contemplated by the preemption provision of the MDA. *Medtronic* at ——, 116 S.Ct. at 2258. Unlike in *Medtronic*, the labeling requirements here are specific in that they apply only to investigational devices; they are not, therefore, generic requirements.

Like in *Medtronic*, the state requirement here was not specifically developed "with respect to" medical devices. As noted in *Medtronic*, the "failure to warn claim is the general duty to inform users and purchasers of potentially dangerous items of the risks in-

volved in their use." *Id.* However, the arguments articulated in connection with the manufacturing and design defect claims apply as well to the inadequate warning claim. Namely, the state requirement would impede the implementation and enforcement of specific federal requirements. To allow a state cause of action for inadequate warnings would impose different requirements or requirements in addition to those required by federal regulations. Such requirements would impede Congress' intent in enacting the investigational device exemption to promote the development of medical devices for human use to the extent consistent with safety to human life.

### D. Nonconformance to Express Representations

■ Count IV of Plaintiffs' complaint alleges that Telectronics is liable under § 2307.77 of the Ohio Revised Code for failure to conform to express representations. Section 2307.77 states:

A product is defective if it did not conform, when it left the control of its manufacturer, to a representation made by that manufacturer. A product may be defective because it did not conform to a representation even though its manufacturer did not act fraudulently, recklessly, or negligently in making the representation.

Ohio Rev.Code Ann. § 2307.77. We addressed this claim in detail in our previous opinion:

We conclude that, in the context of investigational devices, express warranty claims are also preempted.

Express representations made about investigational devices are subject to comprehensive FDA regulation. For example, 21 C.F.R. § 812.5 mandates the contents of investigational device labels; § 812.7 prevents the commercialization and promotion of investigational devices, and prohibits any representation that "an investigational device is safe or effective for the purposes for which it is being investigated"; and § 812.25(f) requires submission of all investigational device labeling to the FDA for approval. Thus, the representations

that can, cannot, and must be made about an investigational device are all determined by the FDA.

Plaintiffs' [sic] advance an express warranty claim under state law of "nonconformance to express representational concerning the character, quality, and/or safety of the device." Because such a claim would, in effect, impose a requirement "different from or in addition to" an FDA regulation "which relates to the safety or effectiveness of the device," we hold that it is preempted by § 360k(a).

*Martin* at 42 (citations omitted). The intervening decision in *Medtronic* does not change our analysis as *Medtronic* did not involve a breach of warranty claim and nothing expressed in *Medtronic* compels us to reach a different result. As indicated by *Medtronic* and as conceded by defendant, a claim that Telectronics did not comply with MDA regulations governing its device would not be preempted and the Martins could pursue a remedy in state court. However, plaintiffs failed to allege below that Telectronics did not comply with MDA regulations governing devices approved under the IDE. Thus, any remedy available to the Martins under a failure to comply with federal regulations theory has been waived.

### E. Supplier Liability

 Under Ohio Revised Code § 2307.78, a supplier is subject to liability if:

(1) The supplier in question was negligent and that negligence was a proximate cause of harm for which the claimant seeks to recover compensatory damages;

(2) The product in question did not conform, when it left the control of the supplier in question, to a representation made by that supplier, and that representation and the failure to conform to it were a proximate cause of harm for which the claimant seeks to recover compensatory damages.

Ohio Rev.Code Ann. § 2307.78(A). Plaintiffs claim that Telectronics is liable under this section as a supplier of the device. Both methods of imposing liability articulated in this section are inextricably linked to the causes of action discussed previously and are, thus, preempted for the same reasons: under

subsection (1), a claim that Telectronics was negligent in its manufacturing, design, or labeling is preempted; under subsection (2), a claim that Telectronics failed to conform to a representation is similarly preempted.

### F. Derivative Spousal Claims

The final claim of plaintiffs' complaint is brought by Harold Martin for loss of consortium and companionship. Because this claim is derivative of preempted claims, summary judgment was properly granted on behalf of Telectronics.

## VI.

### Seventh Amendment

 On remand, plaintiffs contend that their Seventh Amendment right to a jury trial would be violated if this Court were to hold that their claims are preempted by the MDA. We rejected this argument in our first opinion:

Nothing it its text of history indicates that the Seventh Amendment protects the existence of certain common-law causes of action. The Seventh Amendment protects a litigant's right to a jury trial where there exists a cause of action at common law, or one analogous thereto, for legal relief, where the amount in controversy exceeds twenty dollars. Here, as plaintiffs' causes of action have been preempted by federal law, they have no "suit[ ] at common law" and the Seventh Amendment's guarantees are not implicated.

*Martin* at 42 (citations omitted). We see no reason to depart from our previous holding on this issue.

## VII.

### Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the District Court.