Henry **MOORE, Jr.,** Plaintiff,

v.

**SULZER ORTHOPEDICS, INC.,
et al., Defendants.**

**No. 1:02 CV 9116.**

United States District Court,
N.D. Ohio,
Eastern Division.

May 18, 2004.

Joseph Rathbone Park, Park & Ossian, Clearwater, FL, for Plaintiff.

Edward Walter Gerecke, Carlton Fields Ward Emmanuel Smith, Tampa, FL, for Defendants.

### MEMORANDUM & ORDER

O'MALLEY, District Judge.

Plaintiff Henry Moore, Jr. originally filed this action in Florida state court against defendant Sulzer Orthopedics, Inc.[1] Sulzer removed the action to the United States District Court for the Middle District of Florida. The case was then transferred to this Court as related to Multi–District Litigation ("MDL") No. 1401, known as *In re: Sulzer Orthopedics Inc. Hip Prosthesis and Knee Prosthesis Products Liability Litigation.* In his complaint, Moore alleges he underwent knee replacement surgery and received an orthopedic knee implant manufactured by Sulzer. Moore further alleges that: (1) his implant was coated with a lubricant during the manufacturing process; (2) Sulzer failed to remove this lubricant completely before the implant was placed in his body; (3) the lubricant then caused the implant to bond improperly to his bones; and (4) he ultimately had to have the implant removed and replaced. Moore brings two claims under Florida state law: strict liability for defective design and manufacture, and negligence for defective design and manufacture.

Sulzer now moves for summary judgment on all of Moore's claims, on the ground that they are preempted by federal law (docket no. 675).[2] For the reasons stated below, Sulzer's motion is **GRANTED** and this case is **DISMISSED**.

---

1. Sulzer Orthopedics, Inc. was later renamed Centerpulse Orthopedics, Inc., and then purchased by Zimmer Holdings, Inc. The Court refers to the defendant as "Sulzer."

2. Sulzer's motion for summary judgment was docketed on the "Master Docket" of the MDL, case no. 01–CV–9000.

## I. Background.

The Court has discussed thoroughly the factual and procedural background of the Sulzer MDL in several opinions, and will repeat only a very small part of it here. *See In re Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation*, 268 F.Supp.2d 907, 910–21 (N.D.Ohio 2003) (setting out the litigation history in the context of awarding common benefit attorney fee awards). One of the products manufactured by Sulzer is known as the "Inter–Op acetabular shell" (referred to below as "Inter–Op"), which is one component of a system used for complete hip replacements. Another product manufactured by Sulzer is known as the "Natural Knee II Tibial Baseplate" (referred to below as "NK–II") which is one component of a system used for complete knee replacements. In 2000, Sulzer announced that "a small number of the many [Inter–Op] implant parts that we manufactured may have a trace of lubricant residue on the surface that was not completely removed during the manufacturing process. * * * [I]t appears that bone does not always bond with [these Inter–Ops] when the lubricant residue is present." In 2001, Sulzer announced that some of the NK–IIs it had manufactured apparently suffered from the same manufacturing defect. At the same time that it issued these announcement, Sulzer initiated a voluntary recall of the affected products.

Following these announcements and recalls, hundreds of plaintiffs around the country filed lawsuits against Sulzer. On June 19, 2001, the Judicial Panel on Multi-District Litigation consolidated and transferred all related pending federal litigation to the Northern District of Ohio, and assigned oversight of the MDL proceedings to the undersigned. Plaintiff Moore originally filed his case in Florida state court on April 3, 2002; after the case was removed to federal court, the MDL Panel transferred Moore's case to this Court, as related to the MDL proceeding. This Court received Moore's case on June 25, 2002.

Meanwhile, the parties had engaged in: (1) extensive discovery to determine precisely which manufacturing lots of the Sulzer NK–II and Inter–Op were manufactured improperly; and (2) lengthy settlement negotiations. The settlement negotiations eventually proved fruitful: on May 8, 2002, the Court granted final certification to a national plaintiff settlement class and sub-classes, and granted final approval to a settlement agreement between the plaintiff class and Sulzer. Included in the national plaintiff class were persons who had received certain, specifically-identified NK–IIs, which discovery had revealed were included in the defective manufacturing lots. The NK–II implant received by Moore, however, was *not* one of those identified as having been manufactured improperly. Thus, Moore was not a member of the settlement class.[3]

---

**3.** On June 17, 2000, this Court filed a "Notice Order" in case no. 01–CV–9000 (docket no 358), stating that, in light of the Settlement Agreement, it believed Moore's case was settled and dismissed with prejudice, because Moore had not opted out of the settlement. Moore and Sulzer subsequently filed a stipulation, however, informing the Court that "(1) [Moore] was not implanted with an 'affected product,' as defined in the Settlement Agreement; (2) as such, [Moore] is not a member of the class, and was not eligible to participate in the Settlement Agreement; and (3) accordingly, [Moore's] claims remain vital and the case should not have been designated as dismissed." Case no. 01–CV–9000, docket no. 625 at 2 (Apr. 9, 2003). Accordingly, the Court entered an Order making it clear that Moore's case "retains its active status on this Court's docket, both procedurally and substantively." *Id.*

Because Moore was not a member of the plaintiff class, Moore's case did not settle. After the Court approved the Class Action Settlement Agreement, Moore suggested that, in light of the dismissal of the great majority of the cases originally transferred to the Court as part of the MDL proceeding, his case should be remanded back to the United States District Court for the Middle District of Florida, which was the transferor court. The Court declined Moore's suggestion of remand, noting that the MDL Panel's initial transfer of his case to this Court was for the purpose of oversight of all pretrial proceedings, which had not concluded. *See* case no. 01–CV–9000, docket no. 625 at 2 (Apr. 9, 2003) ("[a]s the parties acknowledge, this case is not ready for trial; thus, without further direction from the MDL panel, it appears that remand is not yet appropriate").[4] The Court believed, and still believes, that continued oversight of Moore's case made sense, because many of the issues in his case (including substantive scientific and financial issues, as well as procedural discovery issues) are identical to those in the MDL proceeding. In fact, the Court retained jurisdiction over several other cases which, like Moore's, were transferred to this Court as related to the MDL proceedings and did not settle, either because the plaintiff was not a class member or because the plaintiff elected to opt out of the class action settlement. Thus, the pending motion for summary judgment is properly addressed by this Court.

*II.  Undisputed Facts.*

Sulzer now moves for summary judgment on Moore's claims, asserting that it is entitled to judgment as a matter of law on the grounds of federal preemption.[5] The uncontroverted factual premise for Sulzer's preemption argument is as follows. In 1994, Sulzer submitted its first-generation Natural Knee implant to the federal Food and Drug Administration ("FDA") for approval as a Class III medical device. In 1996, Sulzer amended its application to include its next-generation product, the NK–II. The FDA approval that Sulzer sought is authorized and required by the Medical Devices Amendment ("MDA") to the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.* Specifically, the MDA divides medical devices into three categories, or classes. The most strict FDA regulation is reserved for Class III devices, defined as those which: (1) are to be used for supporting or sustaining human life or are of substantial importance in preventing impairment of public health; or (2) present a potential unreasonable risk of illness or injury. 21 U.S.C. § 360c(a)(1)(C)(ii)(I-II). To market a Class III device within the United States, "the manufacturer must either submit its product to the FDA for premarket approval ('PMA process'), or qualify for one of two exceptions to this time-intensive regulatory review." *Kemp v. Medtronic, Inc.,* 231 F.3d 216, 221 (6th Cir.2000), *cert. denied,* 534 U.S. 818, 122 S.Ct. 48, 151 L.Ed.2d 19 (2001).

**4.** In addition, the Court declined Moore's suggestion of remand to the Florida district court because it believed that "it is only the MDL panel that can remand the case; this Court can only recommend a remand, if appropriate." Case no. 01–CV–9000, docket no. 625 at 2 (Apr. 9, 2003).

**5.** While Sulzer raised federal preemption as an affirmative defense in its answer to the

plaintiffs' amended and consolidated class action complaint (*see* docket no. 69, ¶ 90 at page 16), as noted, it elected to settle most of the claims against it rather than pursue any of its substantive defenses, including the preemption argument on the merits. The Court, accordingly, has not addressed this issue previously, despite its long history with this and substantial related litigation.

The PMA process "involves close scrutiny of the device by the FDA, and approval requires that the FDA conclude that it has received 'reasonable assurances of [the device's] safety and effectiveness' from the manufacturer." *Id.* (quoting 21 U.S.C. § 360c(a)(1)(C)). To obtain federal approval to market the medical device, the manufacturer must provide the FDA with samples of the device, an outline of the device's components, a description of the manufacturing process, copies of the proposed labels, and various other information. *See* 21 C.F.R. § 814.20(b). These submissions are extensive, and often require supplementation and responses to FDA queries. The FDA "reviews such submissions for an average of 1200 hours before either approving or disapproving the device." *Kemp*, 231 F.3d at 221.

With regard to the NK–II, Sulzer submitted to the FDA extensive data, including details regarding its design, manufacturing methods and processes, quality control procedures, clinical investigations, and how the NK–II would be labeled and marketed. The FDA asked Sulzer to submit additional material and answer certain questions, which Sulzer did. Finally, on March 21, 1997, the FDA approved Sulzer's application to distribute the NK–II.

*III. Summary Judgment Standard.*

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein . . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most

civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989) (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus,* 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

## IV. Medical Devices and Preemption.

The MDA contains the following provision, which addresses the extent to which it preempts certain state law requirements:

> [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement -
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a require-

ment applicable to the device under this chapter.

21 U.S.C. § 360k(a). The Supreme Court addressed this provision in *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), delivering a fractured plurality opinion that is not easy to comprehend. As the Sixth Circuit Court of Appeals noted, "[t]he various courts of appeals that have confronted issues of preemption arising under the MDA have struggled mightily with *Lohr's* language in the effort to discern its holding." *Kemp,* 231 F.3d at 224; *see id.* at 223–24 (discussing the different opinions of the Justices). In fact, issues surrounding the extent of MDA preemption "have sharply divided the various circuit courts which have considered them." *Id.* at 221. A clear example of this division is the Sixth Circuit's explicit rejection, in *Kemp,* of the reasoning used by the Eleventh Circuit in *Goodlin v. Medtronic, Inc.,* 167 F.3d 1367, 1371 (11th Cir.1999). In Moore's case, this difference of opinion is critical and dispositive.

The *Kemp* and *Goodlin* courts examined the MDA preemption provisions in connection with the *same* FDA-approved medical device, a pacemaker manufactured by Medtronic. The central question each court had to answer was whether common-law duties imposed by state tort law are "requirement[s] that are different from, or in addition to, any requirement applicable ... to the device" under the MDA, and therefore explicitly preempted by 21 U.S.C. § 360k(a). The *Goodlin* court concluded that the answer is no, because "neither the FDA's actual review of a device and its supporting information nor the agency's eventual approval of the device imposes any ascertainable requirement upon the device." *Goodlin,* 167 F.3d at 1375. The court explained:

In the typical PMA review and approval, ... the FDA issues no regulation, order, or any other statement of its substantive benchmark. The approval represents only a finding that the manufacturer's proposal to market a device has reasonably assured the FDA of the device's safety and effectiveness. * * * [T]he FDA enters a finding that the applicant has furnished the relevant assurances and therefore may begin to market its device. * * * [The FDA's approval does not] provide any indication of what (if any) specific substantive requirements the FDA may have applied to reach that result. ,

*Id.* (citations and footnote omitted). The *Goodlin* court concluded that, because the FDA's approval of a medical device does not actually impose "substantive requirements" at all, common law tort duties do not impose "different" requirements. Accordingly, the *Goodlin* plaintiff was allowed to pursue her Florida state law claims of negligent design and strict product liability.

The *Kemp* court reviewed the *Goodlin* analysis and squarely disagreed. The Sixth Circuit Court of Appeals stated that "PMA approval by the FDA constitutes approval of the product's design, testing, intended use, manufacturing methods, performance standards, and labeling" which is "specific to the product." *Kemp*, 231 F.3d at 226–27 (quoting *Martin v. Telectronics Pacing Systems, Inc.*, 105 F.3d 1090, 1097 (6th Cir.1997)). The *Kemp* court conceded that, as the *Goodlin* court had noted, "in granting approval for a Class III device, the FDA does not set forth the reasons justifying its decision." *Id.* at 228. But the *Kemp* court found that this concession did not end the analysis:

Impliedly, however, the FDA has relied upon both the PMA submission approved for the original Class III device and the PMA Supplement providing specific information on the proposed modifi-

cation in question. These specific submissions form the basis of the FDA's approval of the PMA Supplement. Thus, we conclude the specific requirements applicable to the [medical device] include the entire relevant PMA and accompanying PMA Supplement .... [T]he information submitted to and approved by the FDA in both the ... PMA and as modified by the... PMA Supplement comprise the specific federal requirements applicable to [the medical device]. ,

*Id.* Accordingly, the *Kemp* court ruled that the plaintiff could not pursue Ohio state law claims for negligence, fraud, and failure to warn, because these claims would work to impose requirements on the medical device that were "different from, or in addition to," the federal requirements. *Id.* at 237 (quoting 21 U.S.C. § 360k(a)(1)). The *Kemp* court "respectfully disagree[d]" with the *Goodlin* court, noting that "*Goodlin's* conception of what constitutes a 'requirement' is irreconcilable with our analysis." *Id.* at 226.

It is important to note that the *Kemp* opinion does *not* stand for the proposition that *all* state law tort claims premised on an alleged defect in an FDA-approved Class III medical device are preempted. As Judge Karen Nelson Moore explained in her concurring opinion:

I agree as well with the more general principle stated by the majority that 'a claim premised on the violation of FDA requirements established for a Class III device through the PMA process is not automatically preempted.' Maj. Op. *ante* at 230. Thus as the majority recognizes, a claim for negligence per se premised on the [complete] absence of a [component of the medical device] required by the FDA approval would not be preempted because the state claim would not impose requirements different

from or additional to the federal requirements.

*Id.* at 237. Thus, the *Kemp* court undertook a careful analysis of each of the plaintiff's claims and concluded that they did, in fact, seek to impose additional requirements on the medical device. For example, in examining the *Kemp* plaintiff's negligence claim, the court concluded:

Medtronic represented [in its PMA submission to the FDA] that the Model 4004M would contain a platinum sputter barrier, but did not represent that the barrier would have a particular thickness. The specific federal requirements established by FDA approval of the Model 4004M PMA Supplement thus contain a requirement that the Model 4004M have a barrier of platinum sputter, and *a claim for negligence per se premised on the lack of such a barrier would not be preempted.* As pled and argued by plaintiffs, however, Medtronic was negligent in failing to manufacture a product that had a platinum sputter barrier *with a uniform 500 angstroms in thickness.* Because the specific federal requirements applicable to the Model 4004M contain no thickness requirement, a jury verdict in plaintiffs' favor on plaintiffs' negligence per se claims would amount to a state requirement "different from, or in addition to," the federal requirements. It follows that plaintiffs' negligence per se claims are preempted.

*Id.* at 232 (emphasis added). The question before this Court in this case, then, is whether the *particular* state-law claims pleaded by plaintiff Moore are preempted.

*V. Analysis.*

█ In his brief in opposition to Sulzer's motion for summary judgment, Moore raises only one argument. Moore notes that: (1) he originally filed his action in Florida state court; (2) he asserted only Florida state-law claims; (3) his case was removed to a federal court sitting in Florida; (4) Florida falls within the Eleventh Circuit; and (5) the Eleventh Circuit's decision in *Goodlin* stands for the proposition that his claims are not preempted by the MDA. Moore then asserts that "the summary judgment issue can only be decided after a determination regarding the proper law to apply," opposition brief at 3, and argues that Sulzer is engaged inappropriately in "forum shopping," seeking to apply *Kemp* instead of *Goodlin.* Moore argues that "the transferee forum must apply the law of the transferor court, regardless of who initiated the transfer." In other words, even though this Court sits in the Sixth Circuit and is bound by its pronouncements, Moore insists the Court should apply the law of preemption as mandated by the Eleventh Circuit in *Goodlin,* and the Court should ignore the Sixth Circuit's analysis in *Kemp.*

Moore's argument is unavailing. Courts that have considered this issue have stated clearly and uniformly that, "[w]hen analyzing questions of federal law, the [MDL] transferee court should apply the law of the circuit in which it is located." *In re Temporomandibular Joint Implants Prod. Liab. Litig.,* 97 F.3d 1050, 1055 (8th Cir. 1996). *See In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.,* 256 F.Supp.2d 884, 888 (S.D.Ind.2003) ("the law of the circuit where the transferee court sits governs questions of federal law in MDL proceedings"); *In re Diet Drugs Prods. Liab. Litig.,* 220 F.Supp.2d 414, 423 (E.D.Pa.2002) ("[a]s an MDL court sitting within the Third Circuit, we must apply our Court of Appeals' fraudulent joinder standard"); *Menowitz v. Brown,* 991 F.2d 36, 40 (2nd Cir.1993) ("a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit"); *In re Korean Air Lines Disaster of September 1, 1983,* 829 F.2d 1171, 1176 (D.C.Cir.1987) ("the law of a transferor forum on a feder-

al question ... merits close consideration, but does not have stare decisis effect in a transferee forum situated in another circuit").

Indeed, the Sixth Circuit Court of Appeals recently addressed this precise question in *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir.2003) (petition for cert. pending). In the context of discussing the law of "antitrust injury," the appellate court stated:

> [T]he district court has responsibility for these cases by assignment of the Judicial Panel on Multidistrict Litigation .... This consolidated proceeding includes cases that were originally filed in various state and federal courts, raising state and federal antitrust claims. The state cases were first removed to federal district court and then transferred to the Eastern District of Michigan. In considering the issue of antitrust injury, the district court applied [to *all* of the antitrust claims] the same analysis, including the application of Sixth Circuit precedent .... As no party has taken issue with this approach, either before the district court or on appeal, we have followed the same path. We note, however, that although it is clear and undisputed that the state antitrust laws at issue all "either follow federal Sherman Act precedent or find federal case law persuasive," and that *in a federal multidistrict litigation there is a preference for applying the law of the transferee district*, it is not clear that precedent "unique" to a particular circuit and arguably divergent from the predominant interpretation of a federal law, such as the Sixth Circuit's "necessary predicate" gloss on the antitrust injury doctrine, should be applied to state antitrust laws or federal antitrust claims that originated in other circuits. As we agree with

the district court that the plaintiffs have alleged antitrust injury as contemplated by the Sixth Circuit, this consideration is of academic interest only. Were the outcome otherwise, it might require further consideration.

*Id.* at 912 n. 17 (emphasis added, citations omitted). In this case, the MDA preemption analysis set out in *Kemp* is not unique to the Sixth Circuit, nor is it divergent from the predominant interpretation. *See Brooks v. Howmedica, Inc.*, 273 F.3d 785, 795 (8th Cir.2001) ("[m]ost courts of appeal have interpreted *Lohr* to mean that the MDA preempts common law claims to the extent that they interfere or conflict with specific federal requirements") (citing *Kemp* and other cases). Thus, it is clear that this Court must apply the *Kemp* preemption analysis, and not the *Goodlin* analysis.

In the face of this overwhelming legal authority that is contrary to his position, Moore cites inapposite case law. Moore asserts that, "when an action is transferred *for convenience of the parties and witnesses*, the transferee court will apply conflicts of law provisions of the state in which the transferor court was located in order to assure that transfers will produce no more than a 'change of courtrooms.'" Brief in opp. at 9 (emphasis added) (quoting *Bouchard v. King*, 870 F.Supp. 269, 272 (D.Minn.1994)). In *Bouchard*, however, the Court specifically noted that, "when an action is transferred, *pursuant to Title 28 U.S.C. § 1404(a)*, the transferee Court will apply the conflicts of law provisions of the State in which the transferor Court was located." *Id.* (emphasis added). The Judicial Panel on Multidistrict Litigation transferred Moore's case to this Court on June 25, 2002, *"pursuant to 28 U.S.C. § 1407,"* not § 1404(a). Docket no. 363 (emphasis added).[6] Transfers pursuant to

---

**6.** Moore also argues, in passing, that: (1) the MDL Panel's transfer order directed this

Court to engage only in "coordinated or consolidated pretrial proceedings;" and (2) the

§ 1404(a) are very different from transfers under § 1407, and implicate different policies. The policy invoked by Moore is that " § 1404(a) should not deprive parties of *state-law* advantages." *Ferens v. John Deere Co.*, 494 U.S. 516, 524, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990) (emphasis added). But the "advantage" Moore would enjoy if the pending motion were decided by a Florida federal court is not one of state law, it is an advantage of a different interpretation of federal law.

■ Indeed, even when a transferee court receives a case pursuant to § 1404(a), it remains true that "the transferee court should decide the *federal* claim based on its own circuit's interpretation of the law." *Hartline v. Sheet Metal Workers' Nat. Pension Fund*, 286 F.3d 598, 599 (D.C.Cir.2002) (emphasis added). *See also Korean Air Lines*, 829 F.2d at 1174 (holding that the rule applicable to § 1404(a) transfers—"the law applicable in the transferor forum attends the transfer"— does not apply to § 1407 transfers); *In re Cardizem*, 332 F.3d at 912 n. 17 (6th Cir. 2003) (citing *Korean Air Lines* with approval). Put simply, this Court's preemption analysis addresses a question of *federal* law, and this Court is required to apply the Sixth Circuit's interpretations of federal law to any case that is transferred to it.[7]

■ Conceivably, the Court's easy conclusion that it must apply the *Kemp* preemption analysis, and not the *Goodlin* preemption analysis, would not be dispositive of the pending motion. As the *Kemp* court noted, "a claim premised on the violation of FDA requirements established for a Class III device through the PMA process is not automatically preempted." *Kemp*, 231 F.3d at 230. Moore could conceivably argue, for example, that Sulzer was negligent in its manufacture of the NK–II he received because Sulzer completely failed to undertake a manufacturing step—say, a product rinse, or a quality control inspection—that is "required" by the FDA. Alternatively, Moore could contend that Sulzer *added* a manufacturing step or process that was in addition to and materially deviated from the manufacturing processes approved by the FDA. But Moore does not offer any such argument or point to any such fact.

At best, in his complaint, Moore offers the following allegation:

> During the manufacturing process, Sulzer failed to remove lubricant from the baseplate, thus compromising the effective nature of such Product. The presence of the lubricant contained as part of the product has caused the baseplate to improperly bond to the Plaintiff's bones, exposing Plaintiff to the lubricant during the surgical process, and otherwise causing other debilitating complications to the Plaintiff.

Complaint at ¶ 7. In support of this allegation, however, Moore points to no specific design element or manufacturing process connected with his NK–II that is possibly faulty. Indeed, Moore does not contradict Sulzer's recitation of *any* of the material facts, which include the following statements: (1) Sulzer submitted to the

---

act of ruling on a motion for summary judgment, which is potentially case-dispositive, exceeds this authority. It is clear, however, that motions for summary judgment are normally ruled on before trial and are thus "pretrial" matters. *See Manual for Complex Litigation (Third)* § 21.34 (discussing summary judgment motions under the heading of "Pretrial Procedures").

7. Even if this Court were free to choose between the Eleventh and Sixth Circuit's analyses of the law of MDA preemption, the Court would choose the latter. Not only does the Court find the *Kemp* analysis more consistent with the *Lohr* plurality than the *Goodlin* analysis, but under *Goodlin*, the preemption provision of the MDA becomes virtually meaningless—a result Congress cannot have intended.

FDA "detailed information concerning the design, manufacturing methods and processes, [and] quality control procedures" for the NK–II; (2) the FDA approved Sulzer's PMA application, "including the precise design and manufacturing specifications for those devices;" and (3) the FDA also required Sulzer to obtain "approval before making design or manufacturing changes affecting the safety or effectiveness of the [NK–II]," which Sulzer did. Brief at 4–5. In fact, Moore applied for MDL Settlement Benefits, but was denied those benefits because his particular NK–II was not identified during MDL discovery as one that was affected adversely by the Sulzer manufacturing change. *See* MDL docket no. 798 (Claims Administrator's response to Moore's appeal of denial of benefits); MDL docket no. 877 (Special Master's approval of the Claims Administrator's final determination). Thus, the only factual discovery pursued by the parties tends strongly to show that Sulzer did *not* fail to remove lubricant residue from Moore's NK–II.[8]

Put simply, Moore has identified absolutely no facts that support the allegations in his complaint, and no facts suggesting that Sulzer departed from the manufacturing process approved by the FDA in connection with his NK–II. Furthermore, Moore does not invoke Fed.R.Civ.P. 56(f), asking that a decision on the pending motion be postponed pending an opportunity to undertake discovery.[9] In other words, Moore does not suggest in any way that, even under *Kemp,* he has a viable claim because Sulzer failed to adhere to an FDA requirement. Rather, the only argument Moore makes in response to Sulzer's motion for summary judgment is that *Kemp* is not applicable and *Goodlin* should apply. Because this argument is not well-taken, Sulzer's motion for summary judgment on Moore's claims, on the grounds of federal preemption must be granted. Based on the undisputed facts, Sulzer is entitled to judgment as a matter of law.

**IT IS SO ORDERED.**

---

8. Also, the MDL discovery revealed that the "background rate" for the failure of an implant to bond to the patient's bone is about 1.5%, absent any product defect. Thus, it is certainly not the case that the failure of Moore's NK–II to bond properly necessarily must be attributed to a product defect.

9. Of course, when assessing a summary judgment motion, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street,* 886 F.2d at 1479–80. The nonmoving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson,* 801 F.Supp. at 4.