**William E. CHAMBERS and Beverly Chambers, Plaintiffs–Appellants,**

v.

**OSTEONICS CORPORATION, Defendants–Appellees.**

No. 96–1742.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1996.

Decided April 3, 1997.

F. Boyd Hovde (argued), Indianapolis, IN, for plaintiffs–appellants.

William P. Wooden (argued), Mary Titsworth Chandler, Wooden & McLaughlin, Indianapolis, IN, for defendant–appellee.

Before WOOD, Jr., KANNE and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Osteonics Corporation ("Osteonics") designed and manufactured a hip prosthesis consisting of a hip stem, femoral head and acetabular component ("hip stem") which was used to replace William E. Chambers' ("Chambers") arthritic right hip in 1985. In 1992, Chambers slipped and fell and the hip stem fractured. Surgical replacement of the fractured hip stem cost Chambers $43,000 in medical expenses, and resulted in chronic pain and a severe limp. Before the fracture, Chambers was able to walk pain-free, with no limp, and was able to play golf. Now, Chambers requires a cane to walk the minimal distances he can handle. He can no longer play golf or engage in recreational activities that require walking. Chambers brought suit against Osteonics, claiming that the hip stem was defective and unreasonably dangerous for its intended use as a hip prosthesis because it was subject to corrosion and weakening, and was incapable of supporting the weight of the average man under reasonably expected forces. This claim was further refined as a result of discovery and the summary judgment process as will be described below. Chambers' wife, Beverly, joined the suit with claims for loss of services, society

and consortium. Beverly Chambers agrees that her claims rise and fall with her husband's case.

The FDA authorized Osteonics to manufacture the hip stem, a Class III medical device, under an "investigational device exemption" (an "IDE"). Class III medical devices are those which operate to sustain human life, are of substantial importance in preventing impairment of human health, or pose a potential unreasonable risk of illness or injury. *See* 21 U.S.C. § 360c(a)(1)(C) and 21 C.F.R. § 860.3(c)(3). The IDE process allows a manufacturer with an experimental device to obtain FDA approval for the device with a less rigorous review process than usual. The purpose of the exemption is to encourage experimentation that would lead to new developments. *See* 21 U.S.C. § 360j(g). In order to obtain an IDE, a manufacturer must provide the FDA with information about, among other things, the device, its manufacture, and the experimental plan for its use. In this case, as part of the information provided to the FDA, Osteonics represented to the FDA that the metal hip stem would meet the specifications of ASTM Standard F–75, including the recommended hardness specification for that standard. Osteonics further represented to the FDA that as part of the manufacturing process, it would x-ray each newly manufactured hip stem, examine the x-ray for metallurgical and other defects, and discard any flawed hip stems. Osteonics also agreed as part of the FDA-approved manufacturing procedures that it would never discard these x-rays. The parties now dispute whether the hip stem met the hardness specification that Osteonics represented to the FDA. Chambers' experts have filed affidavits stating that testing of the hip stem on its removal from Chambers shows that the hip stem did not meet the requisite hardness, and that the hip stem contained numerous metallurgical flaws that weakened it and made it unfit for use as a hip replacement. Osteonics disagrees, but concedes for the purposes of summary judgment that whether the hip stem met the hardness standard or contained other flaws are fact questions. Moreover, Osteonics now admits that it developed a policy of discarding hip stem x-rays about six months after they were taken, rather than retaining them, as it promised the FDA it would.

In the district court, Osteonics moved for summary judgment, arguing that Chambers' claims were preempted by the Medical Device Amendments of 1976 (the "MDA"). Chambers responded that a claim arising from a defect that occurred as a result of failing to follow or negligently following the FDA-approved procedures for manufacture of the device is not preempted. Both parties submitted affidavits to the court, Chambers to show that Osteonics had been negligent in the manufacture of the hip stem, and Osteonics to show that it had followed the FDA-approved procedures. The district court granted summary judgment in favor of Osteonics, holding that all of Chambers' claims were preempted by the MDA except for the negligent manufacture claim, and that Chambers had produced insufficient evidence on that point to survive a motion for summary judgment.

On appeal, Chambers argues that the affidavits of its experts, in combination with Osteonics' disposal of the x-ray of the hip stem in contravention of the FDA-approved procedures, are enough to create a genuine issue of material fact about whether Osteonics negligently manufactured the hip stem. Chambers also argues on appeal that the strict liability claim and breach of implied warranty claim, in addition to the negligence claim, are not preempted. Osteonics, in turn, argues that all of Chambers' claims are preempted, and argues alternatively that even if the negligent manufacturing claim is not preempted, Chambers' failure to identify the particular negligence in the manufacturing process is fatal to his claim.

## DISCUSSION

We review the district court's grant of summary judgment de novo. *Green v. Shalala*, 51 F.3d 96, 99 (7th Cir.1995). Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The two issues facing us are whether Chambers' claims are preempted, and if not, whether

Osteonics has met its burden of showing that there is no genuine issue of fact and it is entitled to judgment as a matter of law. Chambers' complaint sweeps broadly, claiming that "[t]he hip stem was defective and unreasonably dangerous for its intended use as a hip prosthesis in that it was subject to corrosion and weakening with the resultant incapability of maintaining the weight of the average male person under reasonably expectable forces to the prosthesis without fracture." According to Chambers, implicit in this complaint are claims for negligent manufacture, strict liability, and breach of implied warranty.

The principle of preemption arises from the Supremacy Clause of the Constitution which states that "the Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. Pursuant to this authority, Congress may preempt state law. Because the intent of Congress controls on issues of preemption, "[i]f the statute contains an express preemption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993). The MDA contains such an express preemption clause:

> Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k. The parties here are arguing only over the first prong of the express preemption clause—whether state law claims for strict liability, breach of the implied warranty of merchantability and negligence impose requirements on Osteonics that

are different from or in addition to the requirements already imposed by the MDA. Section 360k confirms that Congress intended to preempt some state law claims but does not address the scope of Congressional intent.

The Supreme Court recently analyzed the scope of preemption under the MDA with respect to devices which enter the market under the expedited "section 510(k) process" used for devices that are substantially similar to those already on the market. *Medtronic, Inc. v. Lohr*, —— U.S. ——, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). In identifying the domain expressly preempted by § 360k, the Court held that we must interpret the preemptive language in the context of certain presumptions about the principle of preemption. "First, because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Lohr*, —— U.S. at ——, 116 S.Ct. at 2250. Thus, in those cases where Congress has legislated in an area traditionally occupied by the States, we begin with the presumption that the "historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* Second, the "purpose of Congress is the ultimate touchstone" in every pre-emption case, which requires a review of not only the pre-emption statute, but the statutory framework, and the structure and purpose of the statute as a whole. *Id.*, —— U.S. at ——–——, 116 S.Ct. at 2250–51. Where language in the statute is ambiguous, and where Congress has authorized a federal agency on the matters contained in the statute, we give substantial weight to the agency's view of the statute. *Id.*, —— U.S. at ——–——, 116 S.Ct. at 2255–56.

In this case, we look to the regulations promulgated by the FDA, the federal agency with authority under the MDA. The FDA regulations relating to preemption state that:

> State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular de-

vice under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements.... The following are examples of State or local requirements that are not regarded as preempted by section 521 of the act:

(1) Section 521(a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.

21 C.F.R. § 808.1(d). Thus, we have noted that certain claims for defective design, failure to warn, and inadequate testing are preempted when these claims would add requirements to devices in excess of the requirements imposed by the FDA. *See Slater v. Optical Radiation Corp.*, 961 F.2d 1330, 1332–33 (7th Cir.1992). But we have also stated that the scope of preemption is limited "to efforts by states to impose sanctions for compliance with federal regulations relating to the safety or efficacy of" the product. *Slater*, 961 F.2d at 1334. Chambers contends that the claim he brings will impose sanctions for Osteonics' failure to comply with federal regulations, the kind of claim *Slater* allows.

Chambers attempts to frame each of his claims, for strict liability, breach of warranty and negligent manufacture in terms of Osteonics' failure to comply with FDA requirements for the hip stem. In particular, Chambers contends that each claim will involve proof that Osteonics failed to follow the manufacturing procedure that it represented to the FDA it would follow, and failed to produce a hip stem of the requisite hardness, free of metallurgical defects. Because the FDA required at least this much from Osteonics, Chambers argues, the state law tort claims do not impose any requirements different from or in addition to any requirement imposed by the FDA.

But a claim for strict liability, under Indiana law, requires proof of the following elements: (1) that the seller is engaged in the business of selling such a product; (2) that the product was defective and unreasonably dangerous; (3) that the defect existed at the time the product left the defendant's control; (4) that the product was expected to and did reach the consumer without substantial change in its condition; and (5) that the plaintiff's injuries were proximately caused by the defective product. *See* Ind.Code § 33–1–1.5–3(a). Similarly, the implied warranty of merchantability requires that goods be "merchantable."

Goods to be merchantable must at least be such as:

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair, average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variation permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

Ind.Code § 26–1–2–314.

Both the strict liability theory and the breach of implied warranty of merchantability theory impose greater requirements on Osteonics than the FDA requirements or the procedures that Osteonics promised the FDA it would follow. For example, the strict liability theory could impose liability on Osteonics for an experimental device that meets all FDA standards and requirements but is still somehow adjudged unreasonably dangerous. The same is true under the breach of warranty theory: Osteonics could be held liable for a device found to be unfit for the ordinary purpose for which such goods are used. Such claims would defeat the purpose of the investigational device exemption, which is "to

encourage, to the extent consistent with the protection of public health and safety and with ethical standards, the discovery and development of useful devices intended for human use, and to that end to maintain optimum freedom for scientific investigators in their pursuit of this purpose." 21 C.F.R. 812.1(a). An IDE thus allows a device that has not yet been proven safe and effective to be used lawfully for the purpose of conducting an investigation of that device. "The FDA can hardly be expected to specify the safe and effective design of a device when it is still experimental. If there were a known safe and effective design, the device would no longer be experimental. The point of the experiment is to find out whether it is safe and effective." *Slater*, 961 F.2d at 1333. As in *Slater*, claims for strict liability or breach of the implied warranty of merchantability "set up a direct collision with federal policy" because the FDA has already decided, rightly or wrongly, that a particular device can be sold, subject only to requirements, procedural in character and designed to assure that this experimental distribution was in fact a worthwhile experiment. Thus, these claims are preempted by the MDA because they impose requirements on Osteonics that are different from or greater than FDA requirements.

■ But the negligent manufacturing claim is distinguishable. To prove negligence under Indiana law, a plaintiff must establish only that the defendant breached a duty owed to the plaintiff and that the breach was the proximate cause of plaintiff's injury. *Barsz v. Max Shapiro, Inc.*, 600 N.E.2d 151, 153 (Ind.App. 1st Dist.1992). The heart of Chambers' negligent manufacturing claim is that Osteonics did not follow the FDA requirements or agreed-upon procedures—that its negligence in the manufacture of the hip stem caused it to be of less than the agreed-upon hardness and to contain certain metallurgical defects that made the hip stem subject to stress cracks under reasonably expected forces. That claim would impose no greater requirements on Osteonics than the FDA itself imposed.

Such a claim should not be preempted because there is no reason to protect a manufacturer who fails to follow the proscribed requirements and procedures for producing a device, even an experimental device. *See Slater*, 961 F.2d at 1334 (the scope of preemption is limited to efforts by states to impose sanctions for noncompliance with federal regulations). In fact, the experiment is not worthwhile if it is not conducted using agreed-upon standards and procedures. The results of an uncontrolled experiment would not be a reliable indicator of the usefulness and safety of the proposed device, defeating the reason for granting the IDE in the first place. We must also consider that for a simple personal injury claim predicated on negligence, Congress is legislating in an area traditionally occupied by the states, and we may only preempt state law in those areas where it is the clear and manifest purpose of Congress to do so. Osteonics offers us no reason to read the MDA as preempting state negligence law when it seeks only to enforce the standards and procedures set out by the FDA. On the contrary, Congress' purpose in allowing IDEs is best served by enforcing FDA standards. Finally, we do not think that allowing a negligence claim that seeks to enforce FDA standards will discourage experimentation in the medical device field. Rather we think it will encourage manufacturers to conduct these experiments pursuant to FDA requirements, taking care not to expose consumers to unnecessary risk. Although some risk is necessary when experimenting with new medical devices, the FDA has set the level of acceptable risk for each device. We see no reason to protect a manufacturer who fails to heed FDA requirements.

The recent Sixth Circuit case of *Martin v. Telectronics Pacing Systems, Inc.*, 105 F.3d 1090 (6th Cir.1997), cited by Osteonics, is distinguishable. *Martin* was decided on remand from the Supreme Court after *Lohr*, and specifically addressed preemption of certain statutory claims for a device approved under an IDE. Plaintiffs there brought claims against the manufacturer of an allegedly defective pacemaker for defective manufacture, defective design, failure to warn, and failure to meet certain express representations. The Sixth Circuit held that because these Ohio statutory claims would impose

requirements greater than those imposed by the FDA on the disputed device, the claims were preempted. In the instant case, Chambers' negligence claim is a common law claim, not statutory, and it is expressly limited to Osteonics' failure to comply with the standards and procedures set out by the FDA in the IDE process. Unlike the claims in *Martin*, the claims brought by Chambers do not, therefore, conflict with the purpose of the investigational device exemption. Further, the Court in *Lohr* specifically stated that "nothing in § 360 denies [a state] the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements." —— U.S. at ——, 116 S.Ct. at 2255.

■ Now that we have decided that one of Chambers' claims survives preemption, we must consider whether it can also survive Osteonics' motion for summary judgment. Osteonics, as the moving party, bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Schroeder v. Barth, Inc.*, 969 F.2d 421, 424 (7th Cir.1992). Every reasonable inference must be drawn in favor of the nonmoving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Osteonics seeks to satisfy its initial burden with an affidavit demonstrating that it followed the FDA-approved manufacturing procedures. The affidavit, attested to by a Quality Control Supervisor at Osteonics at the time the hip stem was produced, explains the significance of a "ticket" that traveled with the hip stems as they were being manufactured. As each step in the manufacturing process was completed, an Osteonics employee who had responsibility for completion of that step initialed the ticket. The ticket that traveled with Chambers' hip stem indicates that the hip stem was x-rayed by an outside vendor and that an Osteonics employee examined the x-ray and noted no defects. Further, the ticket indicates that each of the manufacturing procedures agreed upon with the FDA were completed. Osteonics admits that whether there actually was a defect in Chambers' hip stem is a disputed fact, but argues that because Osteonics has "uncontro-

verted" evidence that it followed the approved procedures, Chambers cannot recover for injuries caused by even an admittedly defective hip stem. Osteonics contends that unless Chambers can supply evidence showing what specific process or procedure was not followed or was performed negligently, it is entitled to summary judgment.

Chambers argues that his experts' affidavits stating that the hip stem was not of the requisite hardness and contained metallurgical defects are enough to defeat summary judgment. If we deem the affidavits inadequate, Chambers invites us to consider the missing x-ray, which Osteonics promised the FDA it would keep on file but, by its own admission, destroyed within approximately six months. Chambers asks us to infer from the destruction of the x-ray that defects in the hip stem were evident on the x-ray. Osteonics, in turn, urges that the district court properly refused to draw a negative inference from the destruction of the x-ray given the specific, uncontroverted evidence of the travel ticket that the x-ray was taken and showed no defects. Additionally, Osteonics characterizes the destruction of the x-ray as the result of standard procedure and not bad faith. Where evidence is discarded under routine procedures, Osteonics contends, no negative inference arises.

The affidavits submitted by Chambers' experts state that the inadequate hardness and metallurgical defects led to the "premature fatigue fracture" that injured Chambers. Osteonics claims that it did all it was required to do, as evidenced by the trip ticket and the injury occurred nevertheless. But this argument misses the point. Osteonics did not do all it was required to do by the FDA. The FDA required it to produce a hip stem of a certain hardness, to check the hip stem for metallurgical defects, and to remove from distribution any hip stems that contained metallurgical defects. Chambers' experts refute that Osteonics met this obligation. The hip stem was not of the requisite hardness and contained metallurgical defects. Yet it was not withdrawn from circulation. The trip ticket does not dispositively prove that Osteonics met the FDA requirements, only that various technicians kept a checklist of procedures followed as the hip stem was being manufactured. Oth-

er than the expert testimony from Chambers, the only way to know if the hip stem was defective (in the sense that it failed to meet FDA requirements) when it left Osteonics' control is to examine the x-ray. And the x-ray has been destroyed by Osteonics. Osteonics says that we cannot draw a negative inference from the destruction of the x-ray because it was destroyed pursuant to standard procedure. But when that "standard procedure" is in violation of FDA procedures, we refuse to draw a positive inference that the hip stem was properly manufactured. That is essentially what Osteonics asks us to do. Whether Osteonics failed to meet FDA requirements and whether this failure caused Chambers' injuries are questions of material fact.[1]

The affidavits of Chambers' experts, which note the defects in violation of the FDA requirements, in combination with the destruction of the x-ray in violation of FDA-approved procedures, are enough to allow a finder of fact to infer that Osteonics did not follow the FDA-approved manufacturing procedures and requirements, and that this failure caused Chambers' injury. That Osteonics has a document showing that it did follow those procedures is not determinative on summary judgment, especially where Osteonics agrees that whether the hip stem met FDA requirements is a question of fact. William Chambers' claims survive summary judgment, and thus it follows that Beverly Chambers' claims do so as well.

REVERSED AND REMANDED.

---

[1] Another way to analyze this claim, not argued by plaintiffs here, is through Indiana case law, which holds that proof of a violation of a statute creates a rebuttable presumption of negligence. *Lewis v. Lockard*, 498 N.E.2d 1024, 1028 (Ind. App. 1st Dist.1986). This presumption does not establish causation. Rather, a "jury is free to find that a violation of a statutory duty is not necessarily the direct cause of the injury." *Id.* The parties agree that for the purposes of summary judgment, we must assume that the hip stem was defective in that it was not of the requisite hardness and contained metallurgical defects. The parties also seem to agree that the hardness requirement was set by the FDA. Thus, Osteonics breached a duty imposed by the FDA by producing a hip stem that did not meet the agreed-upon standards, and under Indiana law, we may presume negligence. This analysis, of course, presumes that Indiana courts would equate breach of an FDA regulation with breach of a statute. For the causation element, we need only look to the affidavits of Chambers' experts which state that the metallurgical defects and lack of hardness led to the stress fracture that injured Chambers. Thus it would appear that the breach of the FDA-imposed duty caused Chambers' injuries. Plaintiffs could have defeated summary judgment under this analysis as well.