Edward A. LEWIS, et al.

v.

INTERMEDICS INTRAOCULAR, INC.

Civ.A. No. 93–007.

United States District Court,
E.D. Louisiana.

Sept. 3, 1998.

Rodney Paul Vincent, Meyer H. Gertler, Louis L. Plotkin, Kimberly J. Sanders, Gertler, Gertler, Vincent & Plotkin, New Orleans, LA, for plaintiff.

Lawrence A. Mann, Stanton E. Shuler, Jr., Charles R. Daniel, II, Leake & Andersson, New Orleans, LA, for defendant.

### ORDER AND REASONS

PORTEOUS, District Judge.

Before the Court is defendant's Motion for Summary Judgment. The parties have submitted lengthy memoranda to support their positions and oral argument was heard on August 2, 1998. After a review of the parties' written and oral arguments and the relevant law, the Court submits the following order and reasons.

## I. BACKGROUND

The five plaintiffs allege that Intermedics' intraocular lens, which is surgically implanted, caused severe damage to their eyes and in one case, caused blindness. The implantation operations were conducted between 1984 and 1986 and their suits were filed between 1992 and 1993.

The motion before the Court results from a reversal by the Fifth Circuit of a summary judgment decision (1994 WL 518044)(E.D.La.1994) (J. Heebe)(granting summary judgment that each state law claim was preempted by federal law except for failure to obtain informed consent claim).[1] The district court ruling was handed down before the Supreme Court's holding in Medtronic, Inc. v. Lohr, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Medtronic

---

1. The consent claim was heard on interlocutory appeal where the appellate court rendered judgment for Intermedics, see Lewis v. Intermedics, 56 F.3d 703 (5th Cir.1995)(referred to hereafter as Lewis I ). See infra n. 2.

2. Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.

L.C.C. Art. 2315.

---

was the first Supreme Court case to address preemption under the Medical Devices Amendments of 1976(MDA) to the Food, Drug and Cosmetic Act which, among other items, governs the intraocular lens.

The Fifth Circuit, in an unpublished but lengthy opinion, handed down its interpretation on the Medtronic case and reversed in part and vacated in part the lower court's ruling and remanded the case for further proceedings. Lewis v. Intermedics, No. 95–31080, slip op., 114 F.3d 1182 (5th Cir.1997) (hereinafter referred to as Lewis II ). The undersigned has been instructed to conduct a careful analysis of plaintiffs' state claims to determine if under Medtronic they are preempted by federal law.

## II. LAW AND ARGUMENT

The issues before the Court are (1) whether plaintiffs' state law claims are preempted by regulations of the Food and Drug Administration (FDA) and (2) if they are not whether the claims involve issues of material fact sufficient to deny or grant summary judgment.

### A. Preemption of state law claims

#### 1. General Overview

Plaintiffs' state law claims, which include defective design, failure to warn and breach of warranty, lie under Article 2315 of the Louisiana Civil Code, the state's general tort liability statutory provision.[2]

To determine if the claims under the general tort article is preempted by federal law, this Court must rely not only on Medtronic but on the interpretation of that case by the Fifth Circuit in Lewis II.

> In Lewis v. Intermedics Intraocular, Inc., 56 F.3d 703 (5th Cir.1995)(hereinafter referred to as Lewis I ), the Court held that the Louisiana Products Liability Act (LPLA), La R.S. 9:2800.51 et seq. does not apply. This is due to the fact that plaintiffs' claims for failure to obtain informed consent from the manufacturer would have accrued at the time the manufacturer allegedly failed to obtain informed consent from the patient which was before the LPLA was passed. This ruling is still in force.

The 44B lens manufactured by defendant is subject to the regulations in the Medical Device Amendments of 1976(MDA) to the Food, Drug and Cosmetic Act, Pub.L. No. 94–295, 90 Stat. 539 (codified in scattered sections of 21 U.S.C.).

The MDA classifies devices into three categories based on the degree of regulatory control necessary to ensure their safety. Rising in complexity and danger from Class I to Class III, the 44B lens falls under Class III which is reserved for items that are used to sustain human life or present a potential unreasonable risk of injury.

Class III devices require premarket approval by the FDA before commercial distribution. 21 U.S.C. 360c(a)(1)(C). There are two exceptions to the rule of premarket approval for Class III devices. The first exception is for those devices, such as a pacemaker, which are "substantially equivalent" to devices already on the market before the effective date of the MDA (May 1976) and may be commercially distributed without premarket approval. 21 U.S.C. § 360e(b)(1). In what is known as a " § 510 (k) process"[3], the device's manufacturer applies to the FDA for a "substantial equivalence" determination. 21 U.S.C. § 360(k).

The second exception is for items which receive an investigational device exemption (IDE) wherein the device may be tested on humans without premarket approval. 21 U.S.C. § 360e(a) *et seq.* An IDE applicant must submit an investigatory plan and submit to continual FDA supervision. If specific requirements are met, the manufacturer is granted an IDE and allowed to sell the device but only to approved facilities and approved physicians as a part of the study scrutinized by the FDA. 21 U.S.C. § 360j(g).

The FDA, in following the Congressional mandate for close supervision of IDEs, developed rules governing IDEs in general. In addition—and of great significance to this decision—the FDA formulated an entirely separate set of detailed regulations dedicated *solely* to the investigation of intraocular lenses (IOLs). *See and compare* 21 C.F.R. § 812, et seq. (IDEs in general) to 21 C.F.R. § 813, et seq. (IDEs for IOLs).

## 2. *MDA preemption*

Within the MDA is a preemption provision to which the Supreme Court devoted much analysis in *Medtronic,* an opinion resulting in a 3–way plurality. The provision states:

[No] State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement -

(1) which is different from, or in addition to any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a).

Congress did not delineate what constitutes a state requirement. The FDA filled the gap with its regulation which provides that:

State requirements are preempted only when ... there are ... specific [federal] requirements applicable to a particular device.... thereby making any existing divergent State ... requirements applicable to the device different from, or in addition to, the specific [federal] requirements.

*Medtronic, Inc. v. Lohr,* 116 S.Ct. at 2260–2261 citing 21 C.F.R. 808.1(d)(1995)(J. Breyer concurrence).

As Justice Breyer noted in his concurrence—which is ostensibly a "swing" vote in the splintered court's opinion—the regulation does not fill all the gaps: "[T]he word 'divergent' does not explain, any more than did the statute, just when different device-related federal and state requirements are closely enough related to trigger pre-emption analysis." *Id.* 116 S.Ct. at 2261. Justice Breyer also wrote: "But the regulation's word "specific" does narrow the universe of federal requirements that the agency intends to displace at least some state law."[4] *Id.*

---

**3.** Section 510(K) was the original section in the Food, Drug and Cosmetic Act.

**4.** The *Lewis II* court stated that Justice Breyer concluded "only specific federal requirements, applicable to a particular device, could preempt

The issue then is whether general tort liability laws—or common law tort claims—avoid the specificity requirement and thus are never preempted by the federal regulations. A badly fractured court resulted in the opinion written by Justice Stevens (joined in full by three justices) with a concurrence by Justice Breyer and one by Justice O'Connor. Justice O'Connor's concurrence was joined by Chief Justice Rehnquist and Justices Thomas and Scalia.

Justice Steven's plurality opinion suggested that because few common law requirements are device specific, "it would be rare indeed for a court hearing a common law action to issue a decree that has 'the effect of establishing a substantive requirement for a specific device.'" *Id.* at 2259, quoting 21 C.F.R. § 808.1(d)(6)(ii).

Justice O'Connor stated that Justice Stevens' conclusion that common-law claims are almost never pre-empted is "bewildering and seemingly without guiding principle." *Id.* at 2262. The critical language of Justice O'Connor's concurrence is as follows:

> Title 21 U.S.C. § 360k(a)(1) directs the preemption of " 'any [state] requirement' ... which is different from, or in addition to, any requirement applicable under [the FDCA] to the device." As explained above, and *as Justice Breyer agrees, ante,* at 2259–60, the term 'requirement' encompasses state common-law causes of action. The Court errs when it employees an agency's narrowing construction of a statute where no such deference is warranted. The statute makes no mention of specificity [of a state law], and there is no sound basis for determining that such a restriction on 'any requirement' exists.

*Id.* at 2264 (emphasis added).

Justice O'Connor ended her well-reasoned concurrence based on the obvious principles of statutory construction by stating:

> I conclude that § 360k(a)'s term 'requirement' encompasses state common-law claims. Because the statutory language does not indicate that a 'requirement' must be 'specific,' either to pre-empt or be pre-empted, I conclude that a state common-

state requirements." *Lewis II* at 13 quoting *Med-*

law claim is pre-empted if it would impose 'any requirement' 'which is different from or in addition to', any requirement applicable to the device under the FDCA.

*Id.* at 2264.

As *Lewis II* characterized the split, Justice Stevens and the three justices who joined his opinion in full concluded that preemption of a state law claims would be rare on the basis that state common-law duties are usually too general to satisfy § 360k and its corresponding regulation, 21 C.F.R. § 808.1(d). *Lewis II* at 16. The balance of the Court (Justice Breyer, together with Justice O'Connor and the three justices who joined her opinion) would find preemption more often, on the basis that state common-law duties are "requirements" under § 360k. *Id.*

*Lewis II* states that the five justices participating in the concurrences did not agree on the necessary specificity of the federal requirements for § 360k preemption and noted that "Justice Breyer would require a greater level of specificity than the other four justices. [Justice Stevens' plurality]" *Id.* The Fifth Circuit thus held that a § 360k preemption will be resolved, in most cases, by focusing primarily on any applicable federal regulations. *Id.* Paraphrasing *Medtronic,* the *Lewis II* Court held:

> In sum, a state law claim is preempted pursuant to § 360k only under the following conditions: (1) there is a *specific* federal requirement, usually a regulation, applicable to a particular device; (2) there is a state requirement (statute, regulation, ordinance, or common-law duty), see 21 C.F.R. § 808.1(b) maintained with respect to the device that is related to safety and effectiveness or to any other matter included in a requirement applicable to the device under the Act, *id.;* and (3) the state requirement is different from, or in addition to, the federal requirement.

*Id.* at 16–17.

*Lewis II* also stated that "this preemption analysis applies regardless of the class of the device and of whether it is made available through premarket approval or through the

*tronic,* 116 S.Ct. at 2260–2261.

two exceptions to it: § 510(k) (as in *Medtronic*) or an IDE (as here)." *Id.* at 17.

The undersigned notes that in the three-part test, the Fifth Circuit italicized the word "specific" with regard to the federal regulation. It is also crucial to note that "specific" is not stipulated with regard to a state statute. Instead the state requirement can include a statute, regulation, or common-law duty.[5] *Id.* at 16.[6]

### 3. Plaintiffs' State Law Claims and Preemption

Armed with this analytical framework and the three sets of input by the Justices, this Court now addresses whether or not plaintiffs' state claims are preempted.

### a. Plaintiffs' state law claim that Intermedics violated FDA regulations in failing to inform its investigators that the design of the 44B was under attack.

*Lewis II*, citing *Medtronic*, unequivocally held: "Plaintiffs' state law claims premising Intermedics' liability on violations of FDA regulations are not preempted." *Lewis II* at 23. Whether this issue survives summary judgment will be discussed in a later section.

### b. Plaintiffs' general state tort liability claims of defective design.

■ To determine if this state law claim is preempted it is necessary to review the FDA's purpose in establishing an IDE exception. The government, and more specifically the FDA, are not in the business of inventing new products; this is the traditional domain of private industry. The purpose of the IDE

is "to encourage, to the extent consistent with protection of public health and safety and with ethical standards, the discovery and development of useful devices intended for human use, and to that end to maintain optimum freedom for scientific investigators in their pursuit of this purpose." 21 C.F.R. 812.1(a). The point of establishing an IDE category is to determine if a design is safe and effective in the experimental stages by subjecting it to intense review. *Chambers v. Osteonics Corporation,* 109 F.3d 1243 (7th Cir.1997)(holding that MDA preempted Indiana strict liability and breach of implied warranty claims for an artificial hip device but negligent manufacture claims were not preempted).

The IDE process is a far more rigorous one than the 510k process that was the subject of the *Medtronic* Court's opinion. In *Medtronic*, the Court held that design defect claims under state products liability law are not preempted by the MDA despite FDA approval based on "substantial equivalency." *Medtronic*, 116 S.Ct. at 2255. As the Supreme Court pointed out, the 510k "substantial equivalency" exemption process was only intended to maintain the status quo relative to the marketing of existing medical devices (such as pacemakers) and their substantial equivalents (such as the pacemaker under scrutiny in Medtronic). *Id.* The Supreme Court went on to state that the "status quo included the possibility that the manufacturer of the device would have to defend itself against state law claims of negligent design." *Id.* at 2255.

This is not the case with the investigatory exemption for intraocular lenses governed by its own extensive regulatory scheme. 21

---

5. Louisiana is not a common law jurisdiction but for the purposes of this motion, Article 2315 of the Louisiana Civil Code is this state's equivalent of general tort liability found in common law states.

6. This court notes this language carefully because a latter passage in *Lewis II* states: *"Medtronic* makes clear that, for § 360k preemption, specific federal requirements must conflict with specific state requirements to allow preemption." *Id.* at 21. In this passage, the Fifth Circuit dealt with the absence of a specific *federal* requirement for core-adjunct groups in a study and therefore held that it was not preempted.

However, as the *Lewis II* analysis indicates and the plain language of *Medtronic* makes clear, "a § 360k preemption question will be resolved, in most cases, by focusing *primarily* on any applicable federal regulations." *Lewis II* at 16 (emphasis added). More importantly, Justice Breyer focused on the fact that the federal regulations in *Medtronic* were not specific enough to have a preemptive effect. This is because the regulations for the "510k" review of the pacemaker in *Medtronic* employ a general standard based on substantial equivalency to existing pacemaker products.

C.F.R. § 813.1 through 813.170. (These regulations for the lenses alone consist of 59 printed pages from Westlaw.) These devices are not part of the status quo but were experimental. Plaintiffs are correct in asserting that there are no specific design requirements but the point of the IDE is to allow industry, which is far better equipped than government, to design new products in an environment of "optimum freedom" for scientific investigation. *See supra*, 21 C.F.R. 812.1. If there were a known safe and effective design, the device would no longer be experimental. *Chambers*, 109 F.3d at 1248. *See Martin v. Telectronics Pacing Sys., Inc.*, 105 F.3d 1090 (6th Cir.1997) [7]. Subjecting Intermedics to fears about general negligence claims in a design phase—acknowledged by all to be experimental—would thwart the legislative intent to foster innovation. Innovation is, however, not unfettered but is conducted under close scrutiny of the FDA as stipulated in the CFR regulations and more specifically by the regulations devoted to IOLs. Given the intense nature of the IOL approval process, a number of courts agree in post-*Medtronic* decisions that common law claims can impose requirements in addition to the device-specific federal requirements. *Chmielewski v. Stryker Sales Corporation*, 966 F.Supp. 839 (D.Minn.1997) *citing Martin, supra*, (holding that plaintiff's design defect preempted) cert. denied, —— U.S. ——, 118 S.Ct. 850, 139 L.Ed.2d 751 (1998); *Berish v. Richards Medical Co.*, 937 F.Supp. 181, 185 (N.D.N.Y.1996)(noting that circuit jurisprudence held that general state law claims were preempted because the MDA and the IOL Regulations specifically exempted experimental IOLs from the safety and effectiveness standard usually imposed on medical devices; also held that state common law tort claims would impose additional requirements on IOLs subject to IDEs).

Therefore given the congressional mandate for scientific innovation and the detailed regulations that demand intense scrutiny over the design process by the FDA, this court finds that the state law claim of negligent design could impose additional requirements relating to safety or effectiveness and is thus preempted by the MDA, 21 U.S.C. § 360k(a) and 21 C.F.R. 813 et seq. which deals exclusively with intraocular lenses.

### c. *State Law Claims on Failure to Warn*

■ One area upon which many post-*Medtronic* cases agree that is not preempted by federal law is the failure of the company to warn or disclose information during the study regarding potential problems. *Connelly v. Iolab Corporation*, 927 S.W.2d 848 (Missouri, 1996); *Niehoff v. Surgidev*, 950 S.W.2d 816 (Ky.1997); *Baird v. American Medical Optics*, 155 N.J. 54, 713 A.2d 1019, 1998 WL 390995 (N.J.1998); *Chambers, supra; Chmielewski, supra.*

Failure to inform would also violate FDA regulations and per the ruling in *Lewis II* as discussed in II(A)(3)(a) *supra*, Intermedics violations of FDA regulations are not preempted. *Lewis II* at 23.

Accordingly, this state law claim is not preempted.

### B. Summary Judgment

■ This Court must now determine if plaintiffs' state law claims survive summary judgment.

Summary judgment is appropriate where the record shows no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The facts must be viewed in

---

**7.** The Court also finds persuasive *Slater v. Optical Radiation Corporation*, 961 F.2d 1330 (7th Cir.), cert. denied, 506 U.S. 917, 113 S.Ct. 327, 121 L.Ed.2d 246 (1992). This case which concerned intraocular lenses was decided before *Medtronic* but is still good law. The *Slater* Court held that state tort law claims of defective design were preempted. The Court stated:

The theory underlying the complaint is that the design of the Stableflex was not sufficiently safe and effective to allow it to be used on human beings. This theory sets up a direct collision with federal policy.... The plaintiff wishes in the name of state tort law to impose additional requirements—namely that the Stableflex have had design characteristics that it lacked—and this engrafting of additional requirements relating to safety or effectiveness is forbidden by the preemption provision in the Medical Device Amendments.
*Id.* at 1333. *See supra*, II(A)(2).

light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The regulatory scheme for supervising intraocular lenses allows a sponsor (such as Intermedics) to manufacture and sell lenses in connection with an investigation study pursuant to an Investigational Device Exemption. The sponsor outlines a study to determine whether the lens is safe and effective. While a lens is being investigated by the manufacturer, FDA regulations prohibit labeling the lens as safe and effective. 21 C.F.R. 813.50(a); 21 C.F.R. 813.47(a). As a first step in the investigation, the sponsor must conduct a core study involving a limited number of patients. The core study data alerts the FDA and the sponsor to problems that should be monitored.

The physician who implants the sponsor's IOL is called an investigator. Investigators work in conjunction with the hospitals and clinics and in this case, there was an institutional review committee in place at the institutions where plaintiffs were implanted with the 44B lens.

Intermedics' lenses were permitted to be distributed to an unlimited number of patients under an adjunct study. A sponsor, such as Intermedics, is required to report to the FDA any adverse reactions that are (or are not) lens-related. In addition, a sponsor is required to notify the institutional review committees and /or its investigators of adverse information, ongoing results of investigations, and the medical and scientific literature relating to its IOL. 21 C.F.R. 813.47(a); C.F.R. 818.153(b)(1) & (2).

Plaintiffs have submitted an affidavit by Dr. Alan Touch, an O.B. who has 25 years of operating and consulting experience and has participated in the FDA regulatory process including developing guidelines with the FDA for products and processes. [Touch affidavit, Exhibit A, pg 2]. His affidavit included 11 supporting exhibits. According to Dr. Touch, Intermedics learned in late 1983 that patients with preexisting eye problems were expected to be at a higher risk for developing post-surgical complications than patients with no preexisting eye disease. [*Id.* at 9]. Dr. Touch states that based on a review of the available documentation, Intermedics did not disclose to the review boards in place over plaintiffs or their physician-investigator, from 1983–1987, the fact that patients with preexisting eye disease were found to be a high risk for complications. [*Id.* at 11, para 41].

In October 1985, according to Dr. Touch, Intermedics' medical monitor [8], Dr. Philip Hessburg, criticized the 44B lens and recommended it be taken off the market because the shape was causing problems in patients. [Id. at p. 12, para 47]. Dr. Touch says that he has seen no information to suggest that Intermedics notified its IRCs and investigators, at any time, relating to the potential problems associated with the design of the 44B.

In addition, plaintiffs submit the affidavit of Dr. Robert Drews, an ophthalmologist specializing in intraocular lenses, who reviewed the records of the five plaintiffs. He states in his affidavit, which is supported by 12 exhibits, that there is a reasonable degree of medical certainty that the 44B lens caused the plaintiffs' injuries. [Drews Affidavit, pp. 5–6, para 12].

Defendant refutes these charges and submits the affidavit of Charles Daniel, II, employed by defendant's firm, who attested that the 73 exhibits attached to his affidavit are true and accurate copies of, among other documents, Intermedics' correspondence with the FDA, medical records, and statements by involved personnel.

One exhibit shows the labeling which came with every intraocular lens sold by Intermedics which indicates the absolute contraindications. The warning states: "The following

---

**8.** A medical monitor is selected by the sponsor to oversee the progress of the investigation study.

21 C.F.R. § 813.3(f).

pre-existing medical conditions have a history of poor results: Rubella cataract, uncontrollable glaucoma, etc." [Daniels Affidavit, Exhibit 65]. This exhibit alone raises an issue of material fact of whether Intermedics failed to inform the appropriate authorities about defects which would then be passed on to the patient.

The Court notes with extreme interest defendant's argument that plaintiffs have failed to prove causation. Intermedics maintains that even if there were proof that they did not properly report its findings there is no proof that had the relevant medical personnel or authorities been informed of the alleged defects that the lenses would not have been implanted.

Plaintiffs survive summary judgment through Dr. Drews' affidavit wherein he states:

"If Intermedics had distributed the information relating to the potential design problems of the 44B, it is my opinion to a reasonable degree of medical certainty that an investigating physician would not have implanted the 44B lens in the five plaintiffs herein. A physician would not, in all likelihood, implant the 44B when its design was thought to cause or exacerbate injury to the eyes in which the lens was implanted. Other intraocular lenses were available to treat plaintiffs' conditions."

[Drews' affidavit, p. 9, para 16]

For the reasons stated above, the Court finds that plaintiffs' state law claim of defective design is preempted by federal law but that the general tort claims of failure to warn and violations of reporting requirements are not preempted.

As for the claims which are not preempted, the Court finds that there are genuine issues of material fact.

Accordingly, the Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.